UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 11-174 (DSD/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Carlos Serabia-Ferrel**, | |
| Defendant. | |

_____

Andrew R. Winter, Assistant United States Attorney, for Plaintiff.
Barry V. Voss for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on June 23, 2011 on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 21). At the hearing, the Government offered testimony from Andrew Mento and Thomas Perzichilli. Both parties submitted post-hearing briefs. (ECF Nos. 30 and 31.) The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, the Court recommends Defendant's suppression motion be **GRANTED**.

### I.   FINDINGS OF FACT

**A.     Testimony of Agent Mento**

At the hearing in this matter, FBI Agent Andrew Mento testified regarding his interactions with Carlos Serabia-Ferrel ("Defendant") on February 17, 2011. Agent Mento testified that, at about 9:05 p.m. on that date, he went to Defendant's apartment unit in Fridley, Minnesota in order to

conduct a "knock and talk." (Tr. 3.) Accompanying Agent Mento were Special Agent Perzichilli, three SWAT team members and two additional law enforcement officers. (Tr. 3–4.) Agent Mento explained that he and Agent Perzichilli were wearing "FBI raid jackets" (Tr. 4) and that he was wearing a bulletproof vest (Tr. 27). Agent Mento testified that he knocked on the door to Defendant's apartment "for five or ten seconds," and "approximately 15 to 20 seconds" later, the door was "opened by an individual later identified as Miguel Lopez Rosales." (Tr. 4, 16.) According to Agent Mento, "immediately thereafter [Defendant] also appeared at the door." (Tr. 4.) Agent Mento testified that he identified himself and his partner as FBI agents and "said that we'd like to come into the apartment and speak with them." (Tr. 5.) Agent Mento stated that, while his gun was concealed under his clothing, Defendant "could see the SWAT team[']s guns." (Tr. 21.) He further testified that he said the words: "Can we come in?" in response to which Defendant and Mr. Lopez Rosales "stepp[ed] back several steps[,] which allowed us to enter the apartment." (Tr. 5.) Neither individual responded verbally to the request to enter. (Tr. 5, 28.) Immediately upon entry, the SWAT team and the other officers conducted "a protective sweep" of the apartment. (Tr. 20.)

Once inside the apartment, Agent Mento asked Defendant for his name and explained "that I wanted to speak to him, that I was there investigating drug trafficking and that we wanted to conduct an interview" to which Defendant replied: "Yes, I'll talk to you." (Tr. 5–6.) He testified that Defendant "was a good English speaker" and that he "replied appropriately to what I was asking him and seemed to understand exactly what I was saying." (Tr. 7.) Agent Mento did not notice any signs of intoxication. (Tr. 7.) Defendant then verbally agreed to allow the officers to search the apartment. (Tr. 8.) Law enforcement was "not able to locate any illegal drugs" pursuant to the consent search. (Tr. 8.) Agent Mento testified that the entire sequence of events from knocking on the door through the time of completion of the initial search took only "about four minutes." (Tr. 8.)

Agent Mento then asked Defendant "to accompany" him to the back bedroom. (Tr. 8.) Defendant complied. (Tr. 8.) Two other agents were also present in the bedroom. (Tr. 9.)[1] In the back bedroom, Agent Mento expressed his strong belief that there were narcotics in the apartment and urged Defendant to cooperate with law enforcement as he has done in the past, stating "that it would be a good course of action to follow." (Tr. 10.) Agent Mento repeated the question: "What were you going to do this evening?" to which Defendant ultimately responded: "I was going to sell three pounds of methamphetamine to Jimmy L[y]." (Tr. 10.) Agent Mento then asked Defendant "where the methamphetamine was." (Tr. 10.) Defendant pointed to a white, plastic bag, "which was literally inches away from [Agent Mento's] right foot." (Tr. 10–11.) Agent Mento asked if the drugs were in the bag. (Tr. 11.) Defendant stated: "Yeah, the drugs are in the bag." (Tr. 11.) Agent Mento then asked: "Can I look?" to which Defendant replied, "Yeah." (Tr. 11.) Agent Mento proceeded to open the bag and discovered three "loaves of methamphetamine wrapped in white plastic that were concealed under some pieces of clothing." (Tr. 11.) Agent Mento testified that, once Defendant "advised that the drugs were there" and Agent Mento was able to locate them, Defendant "was not free to leave." (Tr. 25, 29.) Agent Mento then left Defendant in the apartment, "guard[ed]" by "a contingent of agents," for "several hours" while he drafted an affidavit and obtained a search warrant for the apartment. (Tr. 25, 30.)

Defendant was not provided with a *Miranda* warning until Agent Mento returned hours later, executed the search warrant, and attempted to "formally interview him" at which time Defendant "[v]ery quickly said he wanted an attorney." (Tr. 11–12.)

**B.     Testimony of Agent Perzichilli**

---

[1] At some point while in the back bedroom, Agent Mento informed Defendant that he was not under arrest. (Tr. 8.) It is unclear from the record, however, whether this statement was made before or after questioning began.

3

FBI Special Agent Thomas Perzichilli also testified regarding the "knock and talk" on February 17, 2011. His testimony was substantially similar to that of Agent Mento. Agent Perzichilli confirmed that Defendant and Mr. Lopez Rosales held "the door open and stepped back and motioned" for law enforcement to come in. (Tr. 35.) He further acknowledged that the SWAT team entered the apartment and conducted their protective sweep no more than two or three seconds after Agents Mento and Perzichilli stepped into the apartment. (*See* Tr. 47.) When he entered the apartment, Agent Perzichilli attempted to communicate with Mr. Lopez Rosales but "there was somewhat of a language barrier." (Tr. 35.) He was then informed by Agent Mento "that [Agent Mento] had obtained consent [to search from Defendant] and that we could . . . check the apartment." (Tr. 36.) Agent Perzichilli confirmed that no drugs were found during the initial three-minute search. (Tr. 36.) He further testified that Agent Mento then "asked [Defendant] to accompany us to a bedroom towards the end of the hallway in the back." (Tr. 36.) All three men entered the bedroom, however, Agent Perzichilli testified that he "stepped out of the room briefly" and, when he reentered the room, he "saw Agent Mento with what appeared to be packages of methamphetamine." (Tr. 38.)

Agent Perzichilli estimated that approximately three minutes elapsed between the time of the initial entry into the apartment and protective sweep and the time that he and Agent Mento escorted Defendant to the back bedroom. (Tr. 40.) He reiterated that the protective sweep occurred prior to, and separate from, the consent search. (Tr. 41.)

Defendant was ultimately indicted for conspiracy and possession with intent to distribute methamphetamine. (Indictment, ECF No. 1.)

## II.   CONCLUSIONS OF LAW

**A.   Defendant Did Not Provide Voluntary Consent to Enter or Search the Apartment.**

Defendant contends that any consent to law enforcement's entrance and search on February 17, 2011 was not voluntary, and the evidence seized from the apartment must, therefore, be suppressed.

### 1. Consent Standard

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In essence, voluntariness, requires "an essentially free and unconstrained choice by its maker." *Id.* at 225. "In determining whether a defendant's will was overborne in a particular case," *id.* at 226, the Court must assess "both the environment of the encounter and the nature of the consenting party." *United States v. Zamoran-Coronel*, 231 F.3d 466, 468–69 (8th Cir. 2000). The Court may consider:

> (1) [Defendant's] age; (2) his general intelligence and education; (3) whether he was intoxicated at the time; (4) whether he was informed of his *Miranda* rights before consenting; (5) whether any previous arrests would have informed him of his rights and protections; (6) the length of time he was detained; (7) whether the officers acted in a threatening manner; (8) whether the police made any promises or misrepresentations; (9) whether the police had [Defendant] in custody or under arrest at the time; (10) whether he consented in public; and (11) whether [Defendant] was silent during the search.

*United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010). Only where officers indicate, "by explicit or implicit means, by implied threat or covert force," that a suspect is not free to terminate the encounter or to refuse a consent request does consent become involuntary. *Zamoran-Coronel*, 231 F.3d at 469, quoting *Schneckloth*, 412 U.S. at 228.

### 2. Defendant Acquiesced to a Show of Official Authority.

To the extent the Government argues that the actions of Defendant and Mr. Lopez Rosales by stepping backward constituted implied consent to the entry of law enforcement into the

apartment, the Court disagrees. The Court finds that the Government has failed to meet its burden of proving that Defendant provided voluntary consent for law enforcement to enter and subsequently search the residence.

An attempt to "knock and talk" can become coercive if law enforcement officers "assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up." *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008); *see United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006). Moreover, consent is not voluntary if given only in acquiescence to a claim of lawful authority. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535–36 (11th Cir. 1995) (finding consent to search not voluntary where five officers knocked loudly and entered apartment quickly with guns drawn). "Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact." *United States v. Shaibu*, 920 F.2d 1423 (9th Cir. 1990) (interpreting a defendant's failure to object to a police officer's entrance into his apartment "as more likely suggesting submission to authority than implied or voluntary consent"); *United States v. Shabazz*, 883 F. Supp. 422, 427 (D. Minn. 1995) ("A police officer, by the nature of the officer's implicit power and official status, is inherently coercive.")

While the Court expresses no opinion as to whether Defendant and Mr. Lopez Rosales were coerced into opening the door in the first instance after "five or ten seconds" of consistent knocking by Agent Mento, a reasonable person in Defendant's position would have felt compelled, at a minimum, to submit to the authority of seven armed officers (including a three-member SWAT team with weapons drawn) by not resisting their entrance into the apartment and by permitting the search that ensued. Defendant and Mr. Lopez Rosales did not provide a verbal response to Agent Mento's request to enter, but rather backed away as a SWAT team in full gear immediately swarmed in and conducted a sweep of the apartment before Agent Mento requested consent to search the apartment.

(*See* Tr. 47.) That Agent Mento appeared without warning at Defendant's door, with a fully armed SWAT team and three additional officers in tow, wearing bulletproof vests and official apparel, clearly demonstrates that Defendant and Mr. Lopez Rosales stepped back from the door "in response to a show of official authority" and thus "cannot be deemed to have consented to the agents' entry." *Tovar-Rico*, 61 F.3d at 1536.

For the same reasons, Defendant cannot be said to have voluntarily consented to the search of the apartment. *Id.* at 1536. Although Defendant is 46 years old, has had previous experience with law enforcement, and did not appear to be intoxicated at the time of the search, it is equally true that he was neither provided with a *Miranda* warning nor expressly informed by law enforcement that he had a right to refuse consent. *See Zamoran-Coronel*, 231 F.3d at 470 (concluding that, although officers "bear no obligation to inform suspects of their right to refuse consent . . . , [w]hether an officer did so constitutes 'a significant, but not determinative, factor' in determining voluntariness"). Most importantly, the presence of seven law enforcement officers in the apartment, including three SWAT team members visibly armed with M-4 rifles, compels the finding that Defendant's consent to search was the product of an implied police threat of force and was thus involuntary. A reasonable person in Defendant's situation would no doubt have felt threatened and intimidated by the law enforcement dominated atmosphere and "would have concluded that he had no choice but to acquiesce" and permit the officers to search his residence. *See Poe*, 462 F.3d at 1000.

Considering the totality of the circumstances, the Court concludes that Defendant's consent to search the apartment was not voluntary and was the product of police coercion. The conduct of the officers in storming the apartment with weapons drawn clearly indicated "by implied threat or covert force" that Defendant was not free to terminate the encounter or to refuse a consent request. *See Zamoran-Coronel*, 231 F.3d at 469. The facts leading up to the giving of consent clearly

7

establish that Defendant's will to resist a search was overborne by the presence of seven uniformed law enforcement officers in the apartment, including a SWAT team. Accordingly, the Court finds that the conditions in existence at the time rendered the entry into the apartment unlawful and Defendant's consent to search involuntary.[2] The evidence seized from the apartment must be suppressed.

**B.  Defendant Was Subjected to Custodial Interrogation in the Apartment Without the Benefit of a *Miranda* Warning.**

Defendant also argues that he was in custody at the time of his conversation with Agent Mento, and his statements should, therefore, be suppressed.

**1.  Custody Standard**

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), provides a two part test for determining whether an interrogation occurs in custody. The court must inquire: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112. The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Moreover, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person

---

[2] Although there was testimony that Agent Mento left the apartment to obtain a search warrant, that warrant was never offered into evidence, so the record is silent with respect to which facts were presented to the issuing judge. In any event, by not relying on the search warrant to justify the seizure, the Government appears to concede that the search warrant would not provide an independent source to support the seizure of the evidence. Law enforcement entered Defendant's apartment in violation of the Fourth Amendment. "The evidence obtained following that entry," including that which the FBI may have seized pursuant to a search warrant, "was tainted by the illegal entry." *See generally United States v. Conner*, 127 F.3d 663, 668 (8th Cir. 1997); *United States v. Madrid*, 152 F.3d 1034, 1039 (8th Cir. 1998).

8

being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (holding that, where a police officer intended to arrest a suspected drunk driver but did not communicate that intention to the driver until after a failed sobriety test, the traffic stop was non-custodial).

In evaluating whether or not a suspect is in custody at the time of questioning, the Eighth Circuit has historically considered several "indicia of custody," which "tend to either mitigate or aggravate an atmosphere of custodial interrogation." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Factors to be considered in a custody evaluation may include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* Still, these indicia are not exhaustive and should not be applied ritualistically. *United States v. Brave Heart,* 397 F.3d 1035, 1039 (8th Cir. 2005). Moreover, the Eighth Circuit has since called into question the *Griffin* factors, articulating that the "'most obvious and effective means of demonstrating that a suspect has not been taken into custody' [is] an express advisement that the suspect is not under arrest and that his participation in any questioning is voluntary." *Id.* (quoting *United States v. Czichray,* 378 F.3d 822, 826 (8th Cir. 2004), cert. denied 125 S. Ct. 2514 (2005)). Notably, "[n]o governing precedent of the Supreme Court or the Eighth Circuit has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *United States v. Anaya*, 2010 WL 2196640, *7–8 (D. S.D. May 27, 2010), quoting *Brave Heart,* 397 F.3d at 1039; *see Czichray,* 378 F.3d at 826; *see also United States v. Elzahabi*, 557 F.3d 879,

884 (8th Cir. 2009) ("An explicit assertion that the defendant may end the encounter generally removes any custodial trappings from the questioning.") (quotation omitted), cert. denied, 129 S. Ct. 2781 (2009); *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006). Still, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted) (recognizing the validity of considering the "totality of the circumstances" in determining whether a suspect is in custody); *see Czichray*, 378 F.3d at 826.

### 2. *Miranda* Standard

In order for evidence obtained as a result of custodial interrogation to be used against a defendant at trial, the Fifth Amendment requires that law enforcement advise the individual of his constitutional rights and that he make a valid waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before questioning begins, a suspect in custody must be informed of the following: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed. *Id.* at 444, 469–70, 478–79. Law enforcement officials must use either this formulation of the warnings or "other procedures [that] are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." *Id.* at 467. After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. *Id.* at 473–74. Statements elicited from a suspect in violation of *Miranda* are inadmissible. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

### 3. Defendant's Statements Must Be Suppressed.

Because Defendant was subjected to custodial interrogation without the benefit of a *Miranda* warning, his statements must be suppressed.

Within no more than three or four minutes of the entry and protective sweep of the apartment, Agent Mento escorted Defendant to a back bedroom, with Agent Perzichilli following closely behind. Defendant did not volunteer to speak with law enforcement, but rather submitted to their request that he accompany them to the back bedroom. An additional agent was also in the bedroom at the time of his conversation with Agent Mento. Seven law enforcement agents remained in the apartment in total. The atmosphere was clearly police dominated.

Defendant was not in handcuffs at the time of the interview, however, a reasonable person in his position would not have felt free to leave at any time during the encounter in light of the presence of the SWAT team and other officers in the apartment. Although Agent Mento may have told Defendant at some point early in their conversation that he was not under arrest, once in the bedroom, Agent Mento urged Defendant to cooperate with law enforcement. At no time during this conversation, however, was Defendant provided with a *Miranda* advisory. Agent Mento then proceeded to question Defendant about his plans for the day and the location of narcotics. Defendant was thus subjected to custodial interrogation without the benefit of a *Miranda* warning. Ultimately, Defendant pointed Agent Mento to the location of three pounds of methamphetamine and admitted his plan to sell the drugs to Jimmy Ly. (Tr. 10.)

Given the circumstances, a reasonable person in Defendant's position would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112 (1995). As Agent Perzichilli himself conceded, the objective facts likely made Defendant feel intimidated at the time the SWAT team entered the apartment with guns drawn. (*See* Tr. 39–40.)

Defendant was neither free to leave, nor would a reasonable person in his situation have believed he was free to leave.

The Court finds that Defendant was in custody from the moment law enforcement entered the apartment through the time of his arrest. The agents did not permit Defendant to move about freely and confined him to the back bedroom while they interrogated him. The restraint on Defendant's freedom of movement imposed by the agents was "of the degree associated with a formal arrest." *Czichray*, 378 F.3d at 826. A reasonable person in Defendant's position would have understood he was not at liberty to terminate the interrogation or leave at any time. He then remained in the unremitting custody of law enforcement for approximately three hours while Agent Mento left, obtained, and returned with a search warrant. Defendant was ultimately placed under arrest upon Agent Mento's return to the apartment. Notably, once formally arrested and provided with a *Miranda* warning, Defendant immediately invoked his right to counsel. (Tr. 11–12.) Defendant was in custody from the time the officers entered the apartment. He was then interrogated without the benefit of a *Miranda* warning. All statements made by Defendant to law enforcement are inadmissible.

For the reasons discussed herein, Defendant's statements to law enforcement and all evidence seized from the apartment on February 17, 2011 must be suppressed.

### III.   RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 21) be **GRANTED** as follows:

1)   All evidence seized from the apartment should be suppressed; and

2)   All statements made by Defendant to law enforcement should be suppressed.

DATED: July 8, 2011                              *s/ Franklin L. Noel*
                                                 FRANKLIN L. NOEL
                                                 United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **July 22, 2011**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **July 22, 2011,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.